**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Norman B. SMITH and Robert A. Bailey, Defendants–Appellants.**

Nos. 87–1010, 87–1011.

United States Court of Appeals, Tenth Circuit.

Jan. 29, 1988.

Edward B. Simpson, Simpson & Gigounas, San Francisco, Cal. (John Gigounas of Simpson & Gigounas, was also on brief), for defendant-appellant Bailey.

Richard Rideout, Freudenthal, Salzburg, Bonds & Rideout, Cheyenne, Wyo., for defendant-appellant Smith.

David A. Kern, Asst. U.S. Atty., Cheyenne, Wyo. (Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., was also on brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and ALLEY,* District Judge.

---

* The Honorable Wayne E. Alley, United States District Judge for the Western District of Oklahoma, sitting by designation.

HOLLOWAY, Chief Judge.

Defendants-appellants, Norman B. Smith and Robert A. Bailey, were convicted under 18 U.S.C. § 371 and under 18 U.S.C. §§ 1014 and 2 for conspiracy and for making false statements to a federally insured institution for purposes of obtaining loan funds. Defendants appeal, arguing: 1) the evidence was insufficient to sustain the convictions; and 2) the verdict form was improper so as to deny them due process. We affirm.

I

Viewing the evidence favorably to the verdict, as we must, it tends to show the following:

This case centers around a construction loan by the Stockman's Bank and Trust Company of Gillette, Wyoming to defendants to finance a condominium project called Knollwood. The bank's deposits are insured by the Federal Deposit Insurance Corporation. In December of 1981 defendants applied for a $300,000.00 construction loan for the Knollwood project. They submitted a brochure to the Stockman's bank which stated: "The Construction Financing requested by Alpha IV on this project is only for: A/E, Design, Minimum Site-Work, Foundations, Landscaping, and Site completion." Government Ex., 1 at 11. Defendants orally explained the money would be used for these purposes only.

The bank approved the loan, which was set up for disbursement as follows: defendants formed Alpha IV Development Corporation ("Alpha"), which then opened an account at the bank. Subcontractors would submit their bills to Alpha which would then submit them to the bank as invoices. The bank would then disburse portions of the construction loan to Alpha's account and Alpha would issue checks, over defendants' signatures, to the subcontractors.

The loan formalities were completed and two construction firms began work. By June of 1982 work was nearly complete. However, payments to the construction firms stopped unexpectedly and the first payment due on the construction loan became deliquent. When contacted by the

bank defendants gave assurances that money would be forthcoming. On these assurances the bank made several more disbursements. A total of $298,796.96 was advanced to defendants through Alpha, but none of the money was ever repaid. Foreclosure proceedings ultimately left the bank with a loss of approximately $225,000.

Subsequent federal investigation revealed that defendants had submitted sixteen invoices, on eight separate dates, through their own subcontracting corporations: Inter–west, Inc., which they owned jointly; Rocky Mountain Properties, Inc., owned by Smith; and Monarch Construction, Inc., owned by Bailey. The bank, unaware of defendants' ownership interests in these firms, credited Alpha's account on the basis of the invoices. I.R. at 57–58.

Defendants then wrote checks to themselves or to their subcontracting corporations. They used this money for several purposes unrelated to Knollwood. For example, approximately $230,000 was used to defray "soft" costs such as overhead, travel expenses, office supplies, salaries and expenses of defendants and their businesses, defendant's personal expenses and debts, prior loan obligations, and legal and accounting expenses. II R. at 24–28; V R. at 77–79. A bank officer, Mr. Naramore, testified the bank would not have approved the loan if he had known that portions or all of the $300,000 was going for personal expenses, debts, travel expenses and similar expenses. I R. 56, 73.

Mr. Naramore, formerly president and chairman of the board of the bank after 1983, testified for the Government. He admitted he was somewhat negligent and remiss in his management as to approval of the advances on the invoices. I R. 73, 92–93. The invoices did "demarcate" various legal expenses and things of this nature. I R. 73. These were not within the purposes in the loan proposal, as discussed earlier. Naramore also said as to the statements on invoices about contract services, legal, accounting, office and that type of expense, that he wouldn't say defendants

made false statements; instead "they made statements which was beneficial to them." I R. 117. Mr. Naramore testified further that had he known that Interwest Inc. was owned by Smith and Bailey and that Rocky Mountain Properties was owned by Smith, he would not have made the advances. I R. 75. Naramore also admitted that Ex. 1 showed Smith as the CEO of Rocky Mountain Properties. I R. 137.

On November 21, 1985, a grand jury returned a nine count indictment against defendants. Eight counts were based on the eight separate submissions of invoices. Each count charged the particular submission constituted a violation of 18 U.S.C. § 1014 (making false statements to a federally insured institution for purposes of influencing action on loans or extensions of them and 18 U.S.C. § 2 (aiding and abetting). The remaining count charged defendants with conspiracy in violation of 18 U.S.C. § 371 and identified the eight submissions as overt acts. Defendant Bailey testified that all expenses charged to the bank loan by him, by Monarch, RPM or Smith were directly related to the Knollwood project as direct costs, expenses or service fees. IV R. 161–201; V R. 3–90.

A jury convicted defendants on the conspiracy count and five of the false statement counts. Defendant Smith was sentenced to four years' imprisonment on the conspiracy conviction, to be served consecutively with another sentence he was already serving. Defendant Bailey was sentenced to three years' imprisonment on the conspiracy conviction. Both defendants received suspended sentences on the five substantive convictions and were placed on five years' probation to commence upon release from confinement.

## II

Defendants contend the evidence was insufficient to support the charges for which they were convicted. The indictment's substantive counts alleged that the eight submitted invoices were for amounts "intended for [defendants'] *personal use unrelated to said project.*" (emphasis added). *E.g.* I R. Item 1, at p. 4. Defendants contend the

United States failed to introduce any evidence the amounts were for personal use and were unrelated to the Knollwood project. We find this argument unpersuasive.

■ A criminal defendant can only be tried on an indictment as found by a grand jury, and especially upon all language found in the charging part of that instrument. *United States v. Conlon,* 661 F.2d 235, 238 (D.C.Cir.1981), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982). An indictment must contain the elements of the offense and sufficiently apprise the defendant of what he must be prepared to meet. *United States v. Salazar,* 720 F.2d 1482, 1487 (10th Cir.1983), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985). We have held that proof is not required of everything alleged in the indictment, *United States v. Harper,* 579 F.2d 1235, 1239 (10th Cir.), *cert. denied,* 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427 (1978), stating that:

> [p]roving beyond a reasonable doubt that a specific person is the principal is not an element of the crime of aiding and abetting. It is not even essential that the identity of the principal be established. The prosecution only need prove that the offense has been committed. [citations]. The fact that Hayden's name was specifically included in the indictment as a person whom [defendant] aided and abetted does not change what the prosecution must show. Proof of everything in the indictment is not required. When the language of the indictment goes beyond alleging the elements of the offense, it is mere surplusage and such surplusage need not be proved. [citation].

*Id.* at 1239–40; *see also, United States v. Hughes,* 766 F.2d 875, 878–89 (5th Cir. 1985).

■ The essential elements of the offense charged under § 1014 are: 1) that defendant made a false statement to a bank; 2) that he did so for the purpose of influencing the bank's action; 3) that the statement was false as to a material fact; and, 4) that the defendant made the false statements knowingly. *United States v.*

*Bonnette,* 663 F.2d 495, 497 (4th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982). These are the elements and the defendant's specific plans regarding what he will do with the funds once he obtains them is not an element of the offense. Here the intended personal use allegations were merely surplusage and the prosecution did not have to prove them. *See Harper,* 579 F.2d at 1239.[1]

■ The prosecution was required to prove that defendants misrepresented their intentions in the invoices submitted, as charged. Such false representations have been held sufficient to sustain bank fraud convictions. *See, United States v. Shively,* 715 F.2d 260, 264 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 2001, 79 L.Ed.2d 233 (1984) (dictum). In this case, defendants misrepresented their intentions in the invoices submitted. Defendants' original promise was ongoing and was implicitly contained in the invoices submitted. 18 U.S.C. § 1014 prohibits the making of any false statement "for the purpose of influencing *in any way* the *action* of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ..." (emphasis added). For purposes of 18 U.S.C. § 1014 the bank's "action" could be the granting of a loan or the disbursement of loan funds. The question is whether the evidence, both direct and circumstantial, together with the reasonable inferences that can be drawn therefrom, when viewed in the light most favorable to the verdict, is such that a reasonable jury could find the defendants guilty beyond a reasonable doubt. *United States v. Hooks,* 780 F.2d 1526, 1529 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

The prosecution presented evidence that the defendants did not use the funds for the purposes stated in the brochure. F.B.I.

special agent Mortgensen testified that he traced the flow of the funds after the bank disbursed them. II R. at 17. Mortgensen's testimony was clear on Count II as to the use of funds obtained by invoices for $15,000 (Ex. 107), for $6,317 (Ex. 109) and for $6,200 (Ex. 113), not going to Knollwood creditors; it was not clear on the remaining invoices for $60,000 and $15,000 (Exs. 105 and 111) as to their use. On the $60,000 item, however, concerning an invoice for deposit to be applied to Boise Homes (Ex. 105), the Boise Company President testified that he did not recall receiving that amount of money on any kind of housing that the Company manufactures. II R. 7. We feel the Count II conviction is sufficiently supported by the record. *See also* II R. 21–28.[2]

We likewise believe that Count V and the conviction thereon are supported by Mortgensen's testimony. II R. 32. Similar testimony supports the convictions on Count VI (II R. 34), Count VII (II R. 35–36), and in Count IX (II R. 39–40).

■ Count I, the conspiracy charge, and the conviction therefor are supported by circumstantial evidence such as, for example, the approvals by Smith and Bailey of invoices 113 and 133. I R. at 65, 72. They concerned funds that did not go to creditors of the Knollwood project, according to Mortgensen. II R. at 28, 39–40. From the circumstances we feel the jury could draw the findings necessary for the conspiracy conviction.

Due to the ongoing nature of these invoice submissions, we believe a reasonable jury could infer that these expenditures evidenced an intent to deceive the bank. *See United States v. Fairbanks,* 541 F.2d 862 (10th Cir.) (case involving deliberately inflated invoices submitted to federally insured bank), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 532, 50 L.Ed.2d 613 (1976); *United*

---

**1.** A variance between an indictment and the proof may be disregarded if it does not affect an essential element of the offense so as to impair substantial rights of the defendant. *United States v. Nunez,* 668 F.2d 1116, 1127 (10th Cir. 1981); *United States v. Francisco,* 575 F.2d 815, 818–19 (10th Cir.1978); *see also United States v. Hansen,* 701 F.2d 1215, 1221 (7th Cir.1983).

**2.** Mortgensen's testimony was based on his examination of the prosecution's exhibits consisting of the invoice submissions, disbursement records, deposit slips, checks, etc. These exhibits were transmitted to this court as part of a supplemental record under Fed.R.App.P. 10(e).

*States v. Lipkis,* 770 F.2d 1447, 1452 (9th Cir.1985). Most important, a reasonable jury could have found that the invoice submissions evidenced an intent to influence the bank to disburse money, which would then be used in a manner contrary to the initial agreement. And the circumstantial evidence was sufficient for the jury to find defendants guilty of a conspiracy to commit the substantive offenses in violation of 18 U.S.C. § 371. *E.g.* I R. 65 (both defendants approved $6,200 invoice, according to Mr. Naramore, supporting Count II).[3]

### III

■ Defendants next argue that the verdict form was ambiguous and denied them due process. The verdict form, submitted over defendant's objection, required the jury to find defendants guilty or not guilty "of making false statements *and* aiding and abetting." (emphasis added). Defendants argue this wording did not allow the jury to differentiate between conviction as a principal and as an aider and abettor of the offense. Under the wording of the verdict form, each defendant was guilty as a principal and an aider and abettor, or not guilty.

■ We agree with the Government that *United States v. Cook,* 745 F.2d 1311 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985), controls. In *Cook,* we noted that 18 U.S.C. § 2 merely abolishes the common law distinction between principal and accessory and does not create an independent crime. *Id.* at 1315. To aid and abet one must share in the intent to commit the offense, as well as participate in some manner to assist its commission. *United States v. Fischel,* 686 F.2d 1082, 1087 (5th Cir.1982). However, the defendant need not commit all elements of the underlying offense as long as he aided and abetted as to each element. *Id.* A defendant can be convicted as an aider and abettor even though he was indicted as a principal for commission of the underlying offense and not as an aider and abettor, providing that commission of the underlying offense is also proven. *Cook,* 745 F.2d at 1315, (citing *United States v. Kegler,* 724 F.2d 190 (D.C.Cir. 1983)); *United States v. Rodgers,* 419 F.2d 1315, 1317 (10th Cir.1969).

The effect of each count of the indictment was not to charge each defendant with two separate crimes. Instead, as in Count II it was charged that defendants made particular false statements to influence the bank to approve advances and that defendants aided and abetted each other in committing the offense. The effect of the guilty verdict on each count was not to have two separate convictions.

The convictions of the defendants are AFFIRMED.

---

3. We recognize that defendants frequently submitted invoices that contained both true and false statements, some fairly revealing that legal or other expenses were included. On other occasions, defendants submitted both true and false invoices on the same date. Defendants might have made true and false statements simultaneously; however, the making of a false statement, together with other required proof, would support a conviction under § 1014.

Our holding in *United States v. Irwin,* 654 F.2d 671 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982), does not affect this conclusion. In *Irwin,* various counts in the indictment alleged defendants committed substantive offenses, and another count alleged they conspired to commit offenses against the United States, these offenses being the same as those alleged in the substantive counts. We reversed some of the substantive convictions and then reversed the conspiracy conviction because we could not determine "whether the jury based its conspiracy verdict on a conspiracy to commit those very offenses [that we reversed]." *Id.* at 680. Here, we examine each conviction, viewing all the evidence together with all reasonable inferences therefrom in the light most favorable to the government. *Id.* at 673. We do not reverse the convictions since there is evidence to support the convictions under the standard of proof of guilt beyond a reasonable doubt.